UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| BUNA JEAN MUSSER, AND | ) | CIVIL ACTION NO.: |
| THOMAS MUSSER | ) | |
| Plaintiffs, | ) | SECTION: |
| | ) | |
| | ) | MAGISTRATE: |
| vs. | ) | |
| | ) | |
| | ) | **COMPLAINT** |
| | ) | |
| MEDTRONIC, Inc.; MEDTRONIC | ) | **JURY TRIAL DEMANDED** |
| NEUROMODULATION, a Division of | ) | |
| MEDTRONIC, Inc.; MEDTRONIC | ) | |
| PUERTO RICO OPERATIONS, and | ) | |
| MEDTRONIC LOGISTICS, LLC, | | |
| Defendants. | | |

## **COMPLAINT**

NOW INTO COURT, by and through undersigned counsel, come Plaintiffs, Buna Jean Musser and Thomas Musser, who bring this Complaint against Defendants: MEDTRONIC, Inc.; MEDTRONIC, Neuromodulation, a Division of MEDTRONIC, Inc.; MEDTRONIC Puerto Rico Operations; and MEDTRONIC Logistics, LLC (referred to collectively as "MEDTRONIC" or "Defendants") and alleges as follows:

## **THE PARTIES**

1.    Plaintiff BUNA JEAN MUSSER, is a natural person residing in Mandeville, St. Tammany Parish, Louisiana.

2.    Plaintiff THOMAS MUSSER, is a natural person residing in Mandeville, St. Tammany Parish, Louisiana.

3.      Defendant MEDTRONIC, INC., is a corporation and resident of the State of
Minnesota, with its registered office address and place of business located at 710
Medtronic Parkway, Minneapolis, Minnesota 55432.

4.      Defendant MEDTRONIC NEUROMODULATION, a division of MEDTRONIC,
INC., is a resident of the State of Minnesota, with its headquarters located at 7000
Central Ave NE, Fridley, MN 55432.

5.      Defendant MEDTRONIC PUERTO RICO, CO., a division of MEDTRONIC, INC., is
a resident of Puerto Rico, with its principal place of business in Ceiba Norte Industrial
Park Road 31, Km 24, HM 4 Call Box 4070, Juncos, Puerto Rico 00777-4070.

6.      Defendant MEDTRONIC LOGISTICS, LLC, is a limited liability corporation or other
business entity and wholly owned subsidiary of Defendant MEDTRONIC, INC., with
its principal place of business at 710 Medtronic Parkway, Minneapolis, Minnesota
55432.

## JURISDICTION AND VENUE

7.      This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332
as there is complete diversity between the Plaintiffs and the Defendants and the
amount in controversy exceeds $75,000 exclusive of costs.

8.      Venue in this judicial district is proper under 28 U.S.C. § 1391(a)(2) because a
substantial part of the events or omissions given rise to this claim occurred within the
Eastern District of Louisiana.

## INTRODUCTION

9.      At all times material hereto, Defendant MEDTRONIC INC., was and is a corporation
or other business entity with its principal place of business in Minneapolis, Minnesota

and was involved in the discovery and/or design and/or assembly and/or manufacture and/or testing and/or packaging and/or labeling and/or marketing and/or distribution and/or sale and/or was otherwise involved in placing in the stream of commerce the medical devices called the SynchroMed® II Implantable Infusion System.

10.     At all times material hereto, Defendant MEDTRONIC NEUROMODULATION was and is a corporation or other business entity and a wholly owned subsidiary of Defendant MEDTRONIC, INC. with its principal place of business in Minneapolis, Minnesota and was involved in the discovery and/or design and/or assembly and/or manufacture and/or testing and/or packaging and/or labeling and/or marketing and/or distribution and/or sale and/or was otherwise involved in placing in the stream of commerce the medical devices called the SynchroMed® II Implantable Infusion System.

11.     At all times material hereto, Defendant MEDTRONIC PUERTO RICO OPERATIONS was and is a corporation or other business entity and a wholly owned subsidiary of Defendant MEDTRONIC, INC. and was involved in the discovery and/or design and/or assembly and/or manufacture and/or testing and/or packaging and/or labeling and/or marketing and/or distribution and/or sale and/or was otherwise involved in placing in the stream of commerce the medical devices called the SynchroMed® II Implantable Infusion System.

12.     Prior to July 10, 2012, MEDTRONIC, INC., designed, manufactured, distributed and/or sold a SynchroMed® II Implantable Infusion System, Model 8637-20 (the "Subject Pump"), an intrathecal sutureless catheter, including, but not limited to Model 8780 (the "Subject Catheter").

13.     The term "SynchroMed® II System" refers to the Subject Catheter and the Subject Pump collectively, unless stated otherwise.

14.     The term "MEDTRONIC" includes all Defendants unless otherwise noted, including but not limited to: MEDTRONIC, Inc., MEDTRONIC Neuromodulation, MEDTRONIC Puerto Rico Operations Co., and MEDTRONIC Logistics, LLC.

15.     At all times herein mentioned, the Defendants, MEDTRONIC, INC. and/or MEDTRONIC NEUROMODULATION Division and/or MEDTRONIC PUERTO RICO OPERATIONS CO., and each of them were authorized to do business within the State of Louisiana and did, in fact, supply, distribute, formulate, market, prescribe and/or sell or otherwise place into the stream of commerce the aforementioned products within the State of Louisiana.

## GENERAL ALLEGATIONS

16.     Buna Jean Musser is a 62-year-old woman who has suffered with chronic bilateral low back pain that radiates to the right hip, right leg and left hip. Mrs. Musser's pain is increased with bending, lifting, walking, sitting for longs periods of time, and any increased activity.

17.     On December 7, 2011, Dr. Chad Domangue of Neuroscience and Pain Institute recommended that Mrs. Musser proceed with the intrathecal morphine trial; however, her insurance company denied the IT trial.

18.     Again, on July 3, 2012, Dr. Chad Domangue suggested that Mrs. Musser have the IT trial, which she was able to schedule at that time.

19.     On July 9, 2012, Mrs. Musser presented to Cypress Pointe Surgical Hospital for the IT pump trial implantation. The procedure was performed by Dr. Chad Domangue. Mrs.

Musser was pleased with the IT trial and agreed to move forward with the implantation of the MEDTRONIC SynchroMed® II Implantable Infusion System.

20.     On February 17, 2013 a MEDTRONIC SynchroMed® II Implantable Infusion System, along with an 8780 catheter, was implanted in Mrs. Musser's body at Cypress Pointe Surgical Hospital in Hammond, Louisiana by Dr. Chad Domangue. The pump was implanted for the purpose of administering intrathecal morphine to control her chronic pain. MEDTRONIC SynchroMed® II System 8637-20 (Serial #NGP382007H). The catheter was model 8780 (Serial #N353364001).

21.     Soon after her MEDTRONIC SynchroMed® II Implantable Infusion System was implanted, Mrs. Musser began to suffer complications.  Mrs. Musser experienced moderate to severe aching, burning, throbbing and shooting pain. Despite months of attempting to alleviate these symptoms by the reprogramming of the pump, Mrs. Musser did not receive any relief.

22.     On August 1, 2014, Mrs. Musser presented to Dr. Domangue with concerns that her pain pump was malfunctioning and also began experiencing increased pain at the pump site.

23.     Over the past three years, Mrs. Musser has been battling the effects of her defective SynchroMed® II System. As a result of the chronic malfunctioning of the SynchroMed® II System, Mrs. Musser is awaiting the explant of the device. Mrs. Musser continues to experience pain and other complications as a result of the device, which has resulted in the significant decline in her quality of life.

23.     In August 29, 2011 the FDA issued a Class I Recall of the SynchroMed® II Device due to the "potential for reduced battery performance that can lead to sudden loss of

therapy". This Recall updated and expanded an FDA 2009 Class I Battery Recall, and included Mrs. Musser's device (Model #8637-20).

24.     In May of 2013, MEDTRONIC NEUROMODULATION issued an "URGENT: Medical Device Removal" letter to customers with Sutureless Connector Intrathecal Catheter Products, including catheter model 8709SC. In the letter, MEDTRONIC noted a redesign intended to reduce the "potential for occlusion at the catheter to pump interface." According to the letter, all unused Models 8709SC, 8731SC, 8596SC, and 8578 with a "Use By" date prior to August 25, 2014 were to be removed from the market. Despite the fact that this letter covered Mrs. Musser's failed catheter, she never received this letter.

25.     This action arises from the product liability of Defendants for their defective medical devices which Plaintiff, Buna Jean Musser, utilized and thereby suffered serious and permanent personal injuries as a direct and proximate result of the defects in the devices as set forth herein. Throughout the history of the SynchroMed® Implantable Infusion System, MEDTRONIC has shown a pattern of delayed responses to known safety issues concerning is SynchroMed® II Implantable Infusion System.  Throughout the history of the manufacture of the Device, the FDA has repeatedly notified MEDTRONIC that its manufacture of the SynchroMed® II System failed to conform to manufacturing requirements enumerated in federal regulations and statute.

26.     Due to known failures of the catheter, the FDA approved MEDTRONIC's revision to Mrs. Musser's 8709SC catheter before her surgery on November 3, 2009. However, MEDTRONIC continued to market, distribute and sell malfunctioning catheters and malfunctioning catheter connections including Mrs. Musser's, even when faced with

numerous complaints related to catheter occlusion and separation. Had Mrs. Musser known about the malfunctioning catheters, she would have not purchased the SynchroMed® System, nor have it implanted in her body. Mrs. Musser's catastrophic injury was easily preventable by Defendants, simply by avoiding the use of a dangerous catheter. Defendants knew the risk, yet put Plaintiff in harm's way. MEDTRONIC's failure to comply with Federal Regulations in the manufacture of the SynchroMed System, and in the delay of implementing changes that could have prevented Plaintiff's injury, is a substantial factor in causing Plaintiff's harm.

27.     Plaintiff's injuries proximately resulted from the negligent and/or other wrongful acts and/or omission and fraudulent misrepresentations of Defendants and/or each of them, to Plaintiff and others, all of which occurred within the venue of this Court.

28.     As a legal result of the above described conduct, Plaintiff has suffered and will continue to suffer damages, including lost wages and benefits, diminished wages and future earnings, mental anxiety and anguish, loss of self-esteem, medical bills all to the damage of Plaintiff in amounts to be proven at trial.

29.     Plaintiff Thomas Musser has experienced a loss of consortium due to the pain and suffering experienced by his wife.

## FACTUAL ALLEGATIONS APPLICABLE TO ALL CAUSES OF ACTION

## THE PUMP SYSTEM

30.     The pump system at issue in this case the SynchroMed® II implantable Infusion Systems ("SynchroMed® II Devices"). The SynchroMed® II Devices are programmable drug infusion systems implanted in the human body for drug delivery. In this case, the SynchroMed® II Devices were used to administer morphine to

7

Plaintiff. The SynchroMed® II Devices are comprised of an infusion pump connected to a thin-flexible catheter, which stores and delivers medication into the intrathecal space (spinal canal) of a patient.

31.    Defendant MEDTRONIC first received premarket approval (PMA) to market the Synchromed® Devices in March of 1988 for the delivery of cancer medication to the terminally ill. FDA regulations require manufacturers to submit PMA supplements or changes that affect the safety and effectiveness of the device, including "[c]hanges in the performance or design specifications, circuit, components, ingredients, principle of operation, or physical layout of the device." 21 C.F.R. 814.39(a)(6)

32.    In January 1991, MEDTRONIC received supplemental PMA approval to market the SynchroMed® Devices for the use with Lioresal (Baclofen) to treat spasticity.

33.    In July 1991, MEDTRONIC received supplemental PMA approval to market the SynchroMed® Devices for the use with preservative free morphine for the treatment of chronic intractable pain of malignant origin.

34.    Controversy arose when in October 1991, MEDTRONIC sought another Supplemental PMA approval to market the use of the SynchroMed® Device for the use of chronic intractable pain of non-malignant origin. During the review, the FDA General Hospital Branch Chief asked the General Hospital Advisory panel to consider the following: "What are the implications of the drug indication as defined for the device? Long-term reliability for treatment of chronic benign pain must be considered. This was less of a concern from a risk/benefit angle for malignant pain." Memo to the Record, General Hospital Branch Advisory Panel Meeting, March 5, 1991, pg 4.

35. Based upon the 1988 PMA approval of the pump, the panel assumed the device could be approved for chronic intraspinal drug administration, however compatibility between the [infumorph] drug and the device had not been established. "In summary, the file is deficient in one area: compatibility . . . This deficiency can be handled in a post-approval study. I recommend an approval letter . . . and approval be granted after the sponsor has agreed to the post-approval requirements." *Id*. at p. 6.

36. At the time MEDTRONIC requested approval of the SynchroMed® II device for use in treatment with chronic intractable pain; "documentation of long-term performance and reliability of the pump and catheter had not been presented."

37. Purporting to serve as documentation of long term performance and reliability, MEDTRONIC presented clinical data for 52 patients using the drug Baclofen in the SynchroMed pump for at least 24 months. MEDTRONIC in their PMA Amendment, stated: "MEDTRONIC considers the clinical data collected for the SynchroMed Infusion system when used for the delivery of intrathecal baclofen to be valid scientific data which support the safety and effectiveness of the device when used to deliver intrathecal preservative-free morphine sulfate solution for the treatment of chronic pain of nonmalignant origin." PMA P860004/S1, Amendment 8, August 1991.

38. Baclofen is not a pain medication, and cannot demonstrate effectiveness, safety, or compatibility between the SynchroMed pump and preservative free-infumorph a medication used to treat retractable and chronic pain.

39. MEDTRONIC has failed to complete its post PMA approval requirements in that they have not provided data supporting the safety, efficacy and compatibility of medications used to treat retractable and chronic pain in the SynchroMed® II pump.

9

40.   Since the initial approval in 1988 of the SynchroMed® Devices, MEDTRONIC sought FDA approval of at least one hundred ninety-one (191) PMA supplements or changes to the device.

41.   The SynchroMed® II Devices are manufactured and distributed in twenty (20) and forty (40) ml reservoir sizes, Model #8637-20 and 8637-40 respectively.

42.   Current MEDTRONIC labeling reports that the SynchroMed® II Devices can be marketed solely for the following uses:

   a.   the chronic epidural/intrathecal infusion of Infumorph (preservative-free morphine sulfate sterile solution) and Prialt® (preservative-free ziconotide sterile solution) for the management of pain;

   b.   the chronic intrathecal infusion of Baclofen (Lioresal) for the management of severe spasticity; and

   c.   the chronic intravascular infusion of floxuridine (FDUR) and methotrexate for the treatment of primary or metastatic cancer.

## SURGICAL IMPLANTATION

43.   MEDTRONIC's Intrathecal Catheters and Sutureless Revision Kits, are designed for use in the intrathecal space with the SynchroMed® II Implantable Infusion System. Each catheter has a pre-attached strain relief sleeve, a connector pin, and a suture-less pump connector that connects to the SynchroMed® II pump.

44.   The entire infusion system is implanted under the skin. One end of a long thin catheter is threaded into the intrathecal space in a patient, near his back, and the other end is thread through the body cavity to the front of the patient to the area of pump placement, which is located just under the skin near the abdomen.  The catheter is then connected

to the pump. A clinician measures a precise amount of medication and injects the medication into the pump's reservoir fill port. The medication passes through a reservoir valve and into the pump reservoir. At normal body temperatures pressurized gas, used as a propellant, is stored below the reservoir and it expands and exerts constant pressure on the reservoir. This pressure pushes the medication into the pump tubing. The battery powered electronics and motor gear delivers a programmed dose of medication through the tubing, out through a catheter port and into a catheter. Medication delivery then continues through the catheter tubing and into the intrathecal space of a patient.

### MEDTRONIC MARKETS THE SYNCHROMED DEVICE

45. Defendants have marketed the SynchroMed® II Devices directly to patients as a "safe effective, reliable medical device; implanted by safe and minimally invasive surgical techniques for the treatment of medical conditions, including the controlled release of morphine for controlling pain in patients suffering from Lumbar Spondylosis and Lumbar Degenerative Disc Disease."

46. MEDTRONIC marketed the SynchroMed® II Devices directly to patients through conversations with MEDTRONIC representatives attending visits with physicians, colorful brochures that depict testimonials from device recipients riding motorcycles, and otherwise enjoying life. MEDTRONIC's marketing representations about the SynchroMed® II Devices include:

a. "a safer way to receive pain medication";

b. "help you rejoin life so you can get back to the activities and people that make you happiest";

11

c.   "allows you to 'Tame your Pain' ";

d.   "reduce your need for oral pain medications";

e.   "provide peace of mind knowing that you've selected a drug delivery system that was manufactured by MEDTRONIC . . .";

f.   "give reassurance because only MEDTRONIC offers a programmable drug delivery system that is FDA approved for MRI scans . . .";

g.   "increase your confidence when you consider that more than 150,000 people worldwide have used MEDTRONIC drug delivery therapy to manage their chronic pain";

h.   "drug delivery therapy from MEDTRONIC is a proven safe and effective therapy";

i.   "MEDTRONIC drug delivery therapy has been tested, is shipped sterile, and is FDA approved"; and

j.   "more doctors trust MEDTRONIC than any other company offering drug delivery therapy."

## FDA PREMARKET APPROVAL (PMA) OF MEDTRONIC'S SYNCHROMED® II DEVICE

47.   Premarket approval (PMA) is the U.S. Food and Drug Administration (FDA) process of scientific and regulatory review to evaluate the safety and effectiveness of Class III medical devices. Class III medical devices are those that 1) support or sustain human life; 2) are of substantial importance in preventing impairment of human health; or 3) which present a potential, unreasonable risk of illness or injury. Due to the level of risk associated with Class III devices, these devices require a premarket approval (PMA) application under Section 515 of the Federal Food Drug and Cosmetic Act (FD&C Act)

21 U.S.C. § 301, et seq. (FD&C Act) before they can be sold in the United States. As mentioned, the SynchroMed® II Device is a Class III medical device.

48.     The PMA application includes Applicant's: a) device description, b) clinical safety trials, c) methods of its product testing, d) design of the device and specific manufacturing controls, e) outcome evaluation and f) proposed labeling. The FDA does not conduct independent testing on a medical device in a PMA application. The FDA reviews the documentation provided by the applicant and relies on the veracity of the applicant. The PMA applicant (in this case MEDTRONIC) is solely responsible for submitting all truthful and necessary documentation to the FDA.

49.     Once an application for PMA is approved, the holder (MEDTRONIC) must comply with any and all post-approval requirements established by the FDA and codified in federal regulations. These requirements include but are not limited to, monitoring, evaluating, and reporting adverse events, compliance with Current Good Manufacturing Practices (CGMP), prohibition of the sale of an adulterated or misbranded product, and prohibition against promoting a device for unapproved uses.

50.     In particular, federal regulations require the PMA holder (in this case MEDTROINC) to conform with the following:

a.  **Review, Evaluate, and Report to the FDA, Adverse Events Associated with the Medical Device.**

        i.   Submit reports of individual adverse events no later than 30 calendar days after the day that you become aware of a reportable death, serious injury or malfunction (21 C.F.R. § 803.10(c)(1)), and

ii.   Report individual adverse events no later than 5 work days after becoming aware of "a reportable event that requires remedial action to prevent an unreasonable risk of substantial harm to the public health . . ." (21 C.F.R. § 803.10(c)(2)(i)).

b.   **Quality System.**  MEDTRONIC shall establish and maintain a quality system that is appropriate for the specific medical device(s) designed or manufactured, and that meets the requirements of this part. (21 C.F.R. § 820.5).

c.   **Management Responsibility.** MEDTRONIC management with executive responsibility shall establish its policy and objectives for, and commitment to, quality. (21 C.F.R. § 820.20).

d.   **Qualified Personnel.** MEDTRONIC shall have sufficient personnel with the necessary education, background, training, and experience to assure that all activities required by this part are correctly performed. (21 C.F.R. § 820.25).

e.   **Corrective and Preventative Action (CAPA).** MEDTRONIC shall establish and maintain procedures for implementing corrective and preventive action, and must document all activities under this section. (21 C.F.R. § 820.100).

f.   **Complaint Files.**  MEDTRONIC shall maintain complaint files, processed in a uniform and timely manner, oral complaints must be documented upon receipt and all complaints must be evaluated to determine whether the complaint represents a reportable event to be reported to FDA under part 803, Medical Device Reporting. (21 C.F.R. § 820.198).

g.   **Statistical Techniques.** MEDTRONIC shall establish and maintain procedures for identifying valid statistical techniques required for establishing, controlling, and

verifying the acceptability of process capability and product characteristics. (21 C.F.R. § 820.250).

h. **Misbranded Drugs and Devices Prohibited.** A drug or device shall be deemed to be "misbranded" if its label is false or misleading in any particular. (21 C.F.R. § 352(a)).

i. **Adulterated Products Prohibited.** If MEDTRONIC fails to ensure that the methods

used in, or the facilities or controls used for, their manufacture, packing, storage, or installation [of the SynchroMed® II Device] are not in conformity with applicable requirements, including but not limited to the Current Good Manufacturing Practice (CGMP) requirement under section 360j(f)(1)  and the Quality System regulation prescribed in 21 C.F.R. Part 820 then such products [SynchroMed® II Device] are considered "**adulterated**." (21 U.S.C. § 351 (h) *emp. added*).

j. **Prohibition of Off-Label Promotion.** MEDTRONIC's SynchroMed® II Device may

not be manufactured packaged, stored, labeled, distributed, advertised, or promoted in a manner that is inconsistent with any conditions to approval specified in the PMA approval order for the device. (21 C.F.R. § 814.80).

## <u>VIOLATIONS OF FEDERAL MANUFACTURING REGULATIONS</u>

51. In August 2006, the FDA, after an inspection of MEDTRONIC's manufacturing plant Located at 800 53rd Avenue NE, Minneapolis, Minnesota, determined that the catheters manufactured, marketed,  sold, and used in the SynchroMed® II Devices were **"adulterated"** "within the meaning of section 501(h) of the Medical Device Act 21

U.S.C. § 351(h) in that the methods used in, or the facilities or controls used for, their manufacture, packing, storage, or installation are not in conformity with the current good manufacturing practice requirements of the Quality System regulation found at Title 21, Code of Federal Regulations (CFR), Part 820." (*See Exhibit 1, August 29, 2006 WARNING LETTER and Form 483*). According to FDA regulations, Current Good Manufacturing Practices (CGMP) are "intended to ensure that finished devices will be safe and effective and otherwise in compliance with the Federal Food, Drug, and Cosmetic Act." 21 C.F.R. 820. The FDA identified the following "Significant Deviations" from CGMP's committed by MEDTRONIC:

a. Failure to implement procedures to ensure that a device's design input requirements are appropriate and address its intended use, including user/patient needs (21 C.F.R. § 820.30(c)) in that design input work for intrathecal catheter Model #8731 has not resulted in development of a complete design specification for the Platinum Iridium (Pt/Ir) catheter tip bond;

b. Failure to conduct design validation using production units or their equivalents in that design validation testing of the intrathecal catheter Model #8731 was conducted with catheters manufactured with a Pt/Ir tip marker bonding process that was different than used in production. (21 C.F.R. § 820.30);

c. Failure to validate a process whose results cannot be fully verified by subsequent inspections and tests, as bonding process for the Pt/Ir catheter has not been validated. (21 C.F.R. § 820.75(a));

d. Failure to control production processes to ensure that a device conforms to its specification. (21 C.F.R. § 820.70(a));

e.  Failure to implement corrective and preventive action procedures addressing the investigation of the cause of nonconformities. (21 C.F.R. § 820.100(a)(2));

f.  Failure to implement changes in methods and procedures needed to correct and prevent identified quality problems. (21 C.F.R. § 820.100(a)(5));

g.  Failure to identify all of the actions needed to correct and prevent the recurrence of nonconforming product and other quality problems. (21 C.F.R. §820.100(a)(3));

h.  Failure to implement procedures to ensure that device history records for each batch, or unit are maintained to demonstrate that the device is manufactured in accordance with regulations. (21 C.F.R. § 820.184).

52.  The FDA Inspector focused predominantly on what was deemed to be MEDTRONIC's poor handling of adverse event reports and inadequate corrective and preventative actions (CAPA's) specifically noting:

a.  nearly 150 reports of granulomas which either were not investigated or were closed without investigation, corrective action or product risk assessment;

b.  that MEDTRONIC had failed to report to the FDA at least 19 articles in the medical literature relating to granuloma and other inflammatory mass formations associated with the intrathecal catheters; and

c.  MEDTRONIC failed to timely file medical device reports (MDR's) with the FDA on at least FIVE (5) health care provider adverse event reports and THIRTY-SEVEN (37) patient/family member adverse event reports.

53.  Significantly, the FDA Warning Letter continued: *"The specific violations noted in this letter and the Form FDA-483 . . . may be symptomatic of serious underlying problems in your firm's manufacturing quality assurance systems."*

54.     The FDA inspected the same Minneapolis MEDTRONIC facility less than a year later, and on July 3, 2007 issued *another* warning letter. The FDA *again* warned MEDTRONIC that their devices at the Minneapolis facility were ***"adulterated"*** and ***"misbranded".*** A partial list of the violations the FDA found during the 2007 inspection included:

a.   MEDTRONIC failed to implement complaint handling procedures to ensure that all complaints are evaluated to determine whether the complaint represents an event that must be filed as a Medical Device Report (MDR);

b.   MEDTRONIC failed to enter several medical and/or scientific literature articles discussing adverse events relating to devices the plant manufactured in the reporting system and failed to evaluate whether the adverse event related articles were required to be reported to the FDA under 21 C.F.R. § 803.50;

c.   MEDTRONIC failed to submit MDR reports within thirty (30) days of receiving or otherwise becoming aware of information that reasonably suggests that a marketed device may have caused or contributed to a death or serious injury (21 C.F.R. § 803.50(a)(1)) specifically:

i.   Failed to report SynchroMed® II Device's intrathecal catheters associated with granuloma or inflammatory masses at or near the distal tip, which the FDA considers "serious injuries";

ii.   Failed to report SynchroMed® II Device's intrathecal catheter fractures;

iii.   Failed to report a malfunction MDR, required when a marketed device malfunction would likely cause or contribute to a reportable death or serious injury;

iv.   Failed to submit MDR reports within thirty (30) days of learning of a problem (pump malfunctions, catheter fracture or separation, inflammatory masses and granulomas) of MEDTRONIC's device in the literature;

v.   Failed to report consumer self-reported adverse events. (21 C.F.R. §803.50); and

vi.   Failed to report to the FDA a correction [Information about Inflammatory Mass] or removal conducted to reduce a risk to health posed by a device. (21 C.F.R. § 806.2(d), 10(a)(1)).

55.   The FDA further warned MEDTRONIC *"[y]our firm has several procedures for Medical Device Reporting and Adverse Drug Experience Reporting. These procedures, in turn reference several other procedures. You firm's current problems regarding MDR reporting, as discussed above in this Warning letter, may be exacerbated by the complexity of your procedures and might have contributed to your firm's deviations from the regulations regarding MDR reporting."*

56.   The FDA inspection also revealed several ongoing violations at MEDTRONIC's Minneapolis Plant's Quality System that were noted in Form 483, stating *"[t]he specific violations noted in this letter and Form FDA 483 may be symptomatic of serious underlying problems in your firm's manufacturing and Quality Assurance systems."* Specifically, the FDA warned that MEDTRONIC:

a.   Failed to achieve consistent compliance in areas such as design controls. (21 C.F.R. § 820.30); and

b.   Failed to achieve consistent compliance in Corrective and Preventative Action (CAPA). (21 C.F.R. § 820.100). *(See Exhibit 2, July 3, 2007 WARNING LETTER)*.

19

57.     On June 1, 2009, the FDA issued a "Warning Letter" to MEDTRONIC concerning their manufacturing facility in Juncos, Puerto Rico, detailing multiple violations of "Current Good Manufacturing Practice (CGMP) requirement of the Quality System (QS) regulation found at Title 21, Code of Federal Regulations (C.F.R.) part 820" found during inspections conducted in late 2008. Based upon those violations (some, but apparently not all of which are set out in the Warning Letter), the FDA determined that MEDTRONIC's SynchroMed® II Devices were ***"adulterated"*** within the meaning of 831(h) of the Federal Food Drug and Cosmetics Act, 21 U.S.C et seq. "in that the methods used in, or the facilities or controls used for, their manufacture, packing, sorting, or installations are not in conformity with the Current Good Manufacturing Practice (CGMP) requirements of the Quality System regulation found at Title 21 Code of Federal Regulations (C.F.R.) Part 820."

58.     The 2009 FDA "Warning Letter" to the Puerto Rico manufacturing plant specifically cited MEDTRONIC for the following violation:

   a.   failing to establish and maintain process control procedures that describe any process controls necessary to ensure conformance to specifications, which shall include monitoring and control of process parameters and component and device characteristics during production;

   b.   failing to establish and maintain procedures for implementing corrective and preventive actions that include identifying the actions needed to correct and prevent recurrence of non-conforming product and other quality problems as required by 21 C.F.R. § 820.100(a);

20

c. failing to establish and maintain procedures that ensure the Device History Records (DHRs) for each batch, lot or unit are maintained to demonstrate that the device is manufactured in accordance with the DHR as required by 21 C.F.R. § 820.184;

d. failing to review, evaluate and investigate complaints involving the possible failure of a device, labeling or packaging to meet any of its specifications as required by 21 C.F.R. § 820.198(c);

e. failing to report to FDA no later than thirty (30) calendar days after the day that MEDTRONIC received or otherwise became aware of information from any source that reasonably suggests that a device MEDTRONIC marketed: 1) may have caused or contributed to a death or serious injury; or 2) has malfunctioned and this device or a similar device that MEDTRONIC marketed would be likely to cause or contribute to a death or serious injury, if the malfunction were to recur, as required by 21 C.F.R. § 803.50(a); and

f. failing to have a person who is qualified to make a medical judgment reasonably conclude that a device did not cause or contribute to a death or serious injury, or that a malfunction would not likely to cause or contribute to a death or serious injury if it were to recur, as required by 21 C.F.R. § 803(c)(2).  Persons qualified  to make a medical judgment include physicians, nurses, risk managers, and biomechanical engineers under 21 C.F.R. § 803.20(c) (2). . . *". [O]ur investigators determine that a product reporting specialist was making decisions about MDR report ability for the MEDTRONIC SynchroMed® II Implantable Pump Infusion System. The training record for this particular employee showed that this person only had a high school diploma with some additional in-house training."*

59.    At the time of inspection, the FDA informed MEDTRONIC of the following manufacturing defects related to the SynchroMed® Devices:

a.  Pumps were manufactured without propellant. The FDA noted that while MEDTRONIC *identified* this problem in May of 2006, and initiated a corrective and preventative action (CAPA) investigation in January 2007, *MEDTRONIC did not voluntarily recall* the thirteen thousand five hundred fifteen (13,515) *devices affected* by this defect until May 2008, *a full two (2) years after the defect was identified;*

b.  Pumps did not show evidence of perforated septum;

c.  Pumps were missing a safety mechanism that served to assure that pumps are never overfilled; and

d.  A *critical step was left out of the manufacturing process*, which is the calculation of drug reservoir levels and drug dispensing rates. *Despite numerous complaints* that MEDTRONIC received regarding accuracy rates, *MEDTRONIC failed to conduct any type of investigation* into this problem.

60.    The FDA also determined that the SynchroMed® II Device were ***"misbranded"*** by virtue of the cited violation involving the failure or refusal to furnish material or information required under the statute and regulations relating to information that the devices may have either caused or contributed to death or serious bodily injury, or malfunctions in such a way that if it were to recur would be likely to cause or contribute to a death or serious injury.

61.    Additionally, while the FDA observed generally that the adequacy of MEDTRONIC's responses could not be determined at the time, the FDA noted "the adequacy of your

corrective and preventative measures will be determined during the next inspection." It specifically noted that MEDTRONIC's response to the violation related to the *"failure to establish and maintain procedures for implementing Corrective and Preventive Action (CAPA) procedures at [the Puerto Rico facility] will be conducted by July 31, 2009." (See Exhibit 3, June 1, 2009 FDA WARNING LETTER).*

62.  Thereafter, in 2012, MEDTRONIC's Minneapolis manufacturing plant was again inspected by the FDA. As a result of that inspection, the FDA issued a Warning Letter dated July 17, 2012 identifying MEDTRONIC's specific violations of federal regulations, including Good Manufacturing Practices and Quality Systems. The FDA informed MEDTRONIC that the devices, including the catheter and SynchroMed® II Devices were ***"adulterated".*** The letter identified specific violations to support the FDA's findings:

a.  Failure to ensure and "establish adequate procedures for corrective and preventive action as required by 21 CFR 8820.100(a)." "You [ ] have not identified the actions to correct and prevent recurrence of non-conforming product." [in that] GCAPA 1485, opened October 26, 2007, relates to motor corrosion resulting in device field failure (motor stalls). Within the Investigation Report for SynchroMed® II Pump corrosion (NDHF1119-88863), it states "corrosion [ . . .]can result in partial or complete removal of gear teeth. This can seize the motor altogether or gear wheel [ . . .] will continue to rotate, but there may be no drug delivery in the region of missing teeth."

b.  "Some identified corrosion issues include wheel 3 corroded teeth, gear binding, gear shaft binding, and bearing binding. This GCAPA includes 567 [product] complaints and has not been closed."

63.  Based upon this violation, the FDA requested a "prompt" meeting with MEDTRONIC executives to discuss the pump motor corrosion failure and the scope and timing of correction actions to address *"ongoing problem."*

64.  The FDA cited MEDTRONIC for incomplete complaint data and incorrect coding decision and noted that this violation *"may have compromised MEDTRONIC's ability to detect and investigate [safety] signals."*

65.  The FDA cited MEDTRONIC for failing to establish adequate procedures for receiving reviewing and evaluating complaints by a formally designated unit, in violation of 21 C.F.R. § 820.198(a), as MEDTRONIC did not document and investigate complaint information for incoming calls relating to pump vibrations, and did not investigate complaints that the pump failed to meet its specifications in several motor stall failures. (21 C.F.R. § 820.198(c)). (*See Exhibit 4, July 17, 2012 FDA WARNING LETTER*).

66.  Between February 14, 2013 and April 3, 2013, the FDA again inspected MEDTRONIC's Neuromodulation manufacturing plant in Minneapolis. Based on those inspections, the FDA again informed MEDTRONIC that it failed to adequately conform to specifications and are not adequately controlled. Specifically, the MEDTRONIC Neuromodulation manufacturing failed to establish procedures for corrective and preventative action for problems including:

a. "Feed through shorting" resulting in motor stalls, whereby at least two hundred ninety-eight (298) serious adverse events have resulted from this defect;

b. Based upon a reported problem with their device, MEDTRONIC failed to implement a recommendation from its Risk Evaluation Board and delayed any action taken. Since the decision to delay the action, at least thirty-seven (37) serious adverse events have been possibly related to the problem;

c. In February 2011, MEDTRONIC detected a signal showing a problem with catheter occlusion, but MEDTRONIC has failed to update a Health Hazard Assessment  for this defect since 2008, with over three hundred (300) complaints occurring since that time.

67.     Specifically, the FDA notified MEDTRONIC that *"[r]egulatory approval was received for Supplement 136 to PMA P860004 on December 15, 2011 to change the design of SC Catheter models 8709 SC, 8731 SC, 8596 SC, and Revision Kit model 8578 to mitigate a known field issue associated with CAPA 1507-SC Catheter Occlusion. This design change was implemented via ECO 12-00985, date March 6, 2012, and the new revisions of Catheter models were released to the field in September 2012. However, the previous SC catheter models which do not conform to the current design have continued to be distributed and have been attributed to 60 complaints of catheter occlusion since September 2012."* (*See Exhibit 5, April 2013 FDA Form-483*).

## MEDTRONIC'S SYNCHROMED® II DEVICE RECALLS

68.     Upon information and belief, MEDTRONIC has issued over fifty recalls since 2004 relating to their SynchroMed devices. Examples of these Recalls are described in the below paragraphs.

69. Since 2008, the FDA has issues 19 Class I Recall Actions for the SynchroMed® II Implantable Infusion Systems. A recall is an action taken to address a problem with a medical device that violates FDA law. Recalls occur when a medical device is defective, when it could be a risk to health, or when it is both defective and a risk to health.

70. A Class I Recall is the most serious recall category issued when there is a probability that the use of the product could cause serious health consequences or death. Any drug or medical device that has been the subject of a Class I Recall can be deadly or cause serious life-long injury.

71. Recently on June 3, 2013, MEDTRONIC Neuromodulation initiated a Class I Recall covering *all* of their Sutureless Connector Intrathecal Catheters, Models 8709C and 8731SC, and Sutureless Revisions Kits, Models 8596SC and 8578 with a *"use by"* date of August 14, 2014. The catheter used by Plaintiff is affected by this Recall. At the time of the recall, there were one hundred fifteen thousand, seven hundred and twenty-two (115,722) sutureless connectors and revision kits in commerce.

72. And on June 3, 2013, MEDTRONIC initiated two (2) Class I recalls of all SynchroMed® II and SynchroMed EL Implantable Drug Infusion Pumps for products manufactured from May of 1998 through June of 2013. MEDTRONIC initiated the recall for the following reasons:

   a. Priming bolus failure during implantation resulting in patients receiving therapeutic drugs unintentionally and at a high rate of infusion in the cerebrospinal fluid followed by a period of reduced drug delivery after the procedures; and

b.  Electrical shorting during the feed through procedure, which leads to loss of or reduction in therapy.

73.  On August 29, 2011, a Class I Recall was issued due to reduced battery performance that can lead to sudden loss of therapy, the Recall included the battery used in Plaintiff's SynchroMed® II Device, Model # 8637-20, Serial # NGP382007H.

74.  Some other Recall examples include: On February 10, 2011, MEDTRONIC initiated a Class I Recall of all their SynchroMed® II Implantable Drug Infusion Pumps, Recall Number z-1060-2011, due to the potential for a pocket fill during a pump refill procedure. A pocket fill is the inadvertent injection during a refill procedure of all or some of the prescribed drug into the patient's subcutaneous tissue, which includes the pump pocket (area under the skin where the pump is placed), instead of the pump.

75.  On March 22, 2008, MEDTRONIC initiated a Class I Recall of all MEDTRONIC SynchroMed® II Implantable Drug Infusion Pumps, Recall number Z-1150-2008, due to reports that patients were suffering inflammatory mass formations at or near the distal tip of intrathecal catheters.

**COMPLAINT FOR PERMANENT INJUNCTION AGAINST MEDTRONIC, INC.**

76.  A Complaint was filed against MEDTRONIC on behalf of the United States of America by the U.S. Department of Justice, in coordination with the U.S. Food and Drug Administration, in the United States District Court for the District of Minnesota, Civil No. 15-2168 *(See Exhibit 6, Complaint for Permanent Injunction)*. Based upon MEDTRONIC's violations of federal law with respect to their manufacturing practices for the SynchroMed® II Implantable Infusion Pump System, the Complaint alleges that MEDTRONIC, S. Omar Ishrak, and Thomas M. Tefft *"are well aware that their*

*practices violate the [Federal Food, Drug, and Cosmetic Act]. FDA has repeatedly warned Defendants, both orally and in writing, about their violate conduct, and has emphasized the importance of Defendants' compliance with the Act."*

77.  The Complaint references the FDA's inspection of MEDTRONIC Neuromodulation's manufacturing facility on February 14 through April 3, 2013, during which "the FDA investigators documented numerous violations of the QS regulation [set forth in 21 C.F.R. 820, et seq.] at MEDTRONIC Neuro," many of which "related directly to the manufacture of the SynchroMed II implantable infusion pump." The Complaint alleges that FDA investigators documented the following violations of 21 C.F.R. 820:

a.  Failing to establish and maintain adequate design validation procedures, complete proper risk analysis, and document the results of the validation, in violation of 21 C.F.R. 820.30(g);

b.  Failing to maintain adequate procedures for identifying actions needed to correct and prevent recurrence of nonconforming products and quality problems, in violation of 21 C.F.R. 820.100(a)(3);

c.  Failing to establish and maintain adequate procedures for verifying or validating corrective and preventative action, in violation of 21 C.F.R. 820.100(a)(4);

d.  Failing to establish and maintain procedures for implementing corrective and preventative action, in violation of 21 C.F.R. 820.100(a);

e.  Failing to establish and maintain procedures for verifying device design, in violation of 21 C.F.R. 820.30(f);

f.   Failing to establish and maintain procedures for identification, documentation, validation, verification, review, and approval of design changes, in violation of 21 C.F.R. 820.90(a); and

g.   Failing to establish and maintain procedures to control products that do not conform to specified requirements, in violation of 21 C.F.R. 820.90(a).

78.   The Complaint alleges that the FDA had previously inspected MEDTRONIC facilities in May 2012, January 2011, January 2007, and June 2006, each time documenting "violations of the QS regulations similar to those [documented] during the April 2013 inspection, including, but not limited to, violations involving: design controls (21 C.F.R. §820.30) and corrective and preventive action (21 C.F.R. § 20.100)." After each such inspection, the FDA issued a Form 483 to MEDTRONIC.

79.   The Complaint further alleges that MEDTRONIC made promises to correct their violations in written responses to each inspection; however, the Complaint alleges that none of the responses contained adequate evidence that MEDTRONIC has corrected their deviations.

80.   The Complaint further avers that the FDA issued Warning Letters to MEDTRONIC on July 17, 2012, July 3, 2007, and August 29, 2006, all of which addressed MEDTRONIC's various QS violations involving corrective and preventive actions, complaint handling and design controls.

81.   In addition to the cited Warning Letters, the Complaint alleges that representatives of MEDTRONIC attended a meeting with FDA's Center for Devices and Radiological Health and Minneapolis District Office on January 31, 2013. At this meeting,

*"Defendants stated that they were aware of the violations at their facilities and were taking steps to correct them."*

82.  The Complaint further states that *"[b]ased upon Defendants' conduct, Plaintiff believes that, unless restrained by order of this Court, Defendants will continue to violate 21U.S.C. §§ 331(a) and (k)*." Under 21 U.S.C. §§ 331(a) and (k), a manufacturer violates federal law when it introduces into interstate commerce any article of device that is adulterated, or causes any article of device to become adulterated within the meaning of 21 U.S.C. § 351 (h) while such devices are held for sale after shipment in interstate commerce.

83.  The Complaint requested a permanent injunction to restrain MEDTRONIC, in their manufacture of the SynchroMed® II Implantable Infusion Pump System, from their continued violation of federal regulations, and further requested the following relief; "That the Court order Defendants and each of their directors, officers, agents, representatives, employees, attorneys, successors, and assigns, and any and all persons in active concert or participation with any of them, to cease directly and indirectly manufacturing, packing, labeling, and distributing (domestically and internationally) SynchroMed® II implantable infusion pumps at or from its MEDTRONIC's Neuromodulation faculties, unless and until Defendants' methods, facilities, and controls used to manufacture, process, pack, label, hold and distribute the SynchroMed® II implantable infusion pumps are established, operated, and administered in compliance with 21 USC 360j(f)(1) and the Quality System regulation prescribed in 21 C.F.R. Part 820, and in a manner that has been found acceptable to FDA."

84.     On April 27, 2015, United States District Court Judge Joan N. Erickson signed a
Consent Decree of Permanent Injunction against MEDTRONIC preventing the
manufacture and distribution of the MEDTRONIC SynchroMed® Implantable
Infusion Pump systems in violation of the terms of the Consent Decree. *(See Exhibit 7,
Consent Decree of Permanent Injunction).*

85.     To this day, MEDTRONIC continues to sell their SynchroMed® II Devices, in direct
violation of the Consent Decree and despite its failures to rectify or otherwise eliminate
its multiple violations of federal law in the manufacture of its SynchroMed® II
Devices.

## *CONTRA NON VALENTEM*

86.     Upon information and belief, MEDTRONIC has known of the defects in the
SynchroMed® II Devices and concealed from patients and doctors for years and/or
failed to alert patients and their doctors of the defective nature of the SynchroMed® II
Devices.

87.     Given MEDTRONIC's failure to disclose this known but non-public information about
the defective nature of the defect – information over which it had exclusive control –
and because Plaintiff could not have reasonably known that the SynchroMed® II
Devices was defective, Defendants are stopped from relying and should not be able to
rely on any exception regarding any period of liberative prescription that might
otherwise be applicable to the claims asserted herein.

88.     Pursuant to the doctrine of *Contra non Valentem Agere Nulla Currit Praescriptio*, the
period of liberative prescription for Plaintiff's claims "commences on the date the
injured party discovers or should have discovered the facts upon which his cause of

action is based."[1] Accordingly, as Plaintiff had no knowledge of the defect with the SynchroMed® II Devices until the Consent Decree was issued on April 27, 2015, and this action is brought within one year of the Consent Decree, Plaintiff's claim is timely.

## FIRST COUNT:
## STRICT LIABILITY MANUFACTURING DEFECT

89.   Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in the paragraphs above, with the same force and effect as if more fully set forth herein.

90.   The averments alleged in this Count include breaches of duties under Louisiana law that parallel duties set forth in federal statutes and regulations described above. Such duties include, but are not limited to, those set forth in 21 C.F.R. 801, *et seq.*, 21 C.F.R. 803, *et seq.*, 21 C.F.R. 814, *et seq.*, 21 C.F.R. 806, *et seq.*, 21 C.F.R. 820, *et seq.*, and 21 U.S.C. §§ 351-352.

91.   Defendants, and each of them, are medical device companies engaged in the design and/or research and/or manufacture and/or production and/or testing and/or assembling and/or labeling and/or packaging and/or distribution and/or sale and/or otherwise placing into the stream of commerce various medical devices intended for human use, as set forth herein, including the SynchroMed® II Devices and for facilitating the infusion and/or consumption and ingestion of pharmaceutical products for the treatment of specific medical conditions.

92.   At the times and places aforesaid and at all times material hereto, Defendants, and each of them, held themselves out as knowledgeable and possessing the requisite skill

---

[1] *Eastin v. Entergy Corp.*, 865 So.2d 49, 55 (La. 2004).

particular to the research and/or manufacture and/or production and/or testing and/or assembling and/or labeling and/or packaging and/or distribution and/or sale of such product(s).

93.   At the times and places aforesaid, and at all times material hereto, as manufacturer of a medical device in the State of Minnesota, MEDTRONIC had a duty under Louisiana law to use reasonable care in the manufacture of the SynchroMed® II Devices to protect people who are likely to be exposed to unreasonable risk of harm, including Plaintiff Buna Jean Musser.

94.   As a medical device manufacturer, MEDTRONIC was at all times material hereto under a duty to conform to and manufacture their products in accordance with federal law and in particular with the provisions of the FDCA and the Current Good Manufacturing Practice (CGMP) requirements of the Quality System regulation found at Title 21, Code of Federal Regulations (C.F.R.), Part 820, *et seq*. which "govern the methods used in, and the facilities and controls used for, the design, manufacture, packaging, labeling, storage, installation, and servicing of all finished devices intended for human use," and which are "intended to ensure that finished devices will be safe and effective and otherwise in compliance with the Federal Food, Drug and Cosmetic Act." (21 C.F.R. 820.1).

95.   At the times and places aforesaid, and at all times material hereto, as a medical device manufacturer in the State of Minnesota and under Louisiana law, MEDTRONIC had a duty to use reasonable care in the manufacture, assembly, inspection, packaging, testing of SynchroMed® II Devices to protect users such as Plaintiff. Reasonable care under the circumstances for a device manufacturer includes complying with federal

regulations designed to insure the safe manufacturer, assembly, inspection, packaging, and testing of medical devices, including but not limited to the CGMP requirements.

96.    At the times and places aforesaid and at all times material hereto, MEDTRONIC failed to manufacture the SynchroMed® II Devices implanted in Plaintiff in a manner such that it would safely and effectively perform as intended and such that the catheter and/or connector components of the SynchroMed® II Devices would remain intact and would function properly and safely.

97.    At the times and places aforesaid and at all times material hereto, MEDTRONIC was in violation of the CGMP requirements and other federal law and MEDTRONIC specifically had been cited by the FDA on multiple occasions for manufacturing *"adulterated"* and *"misbranded"* SynchroMed® II Devices as a result of its non-compliance and non-conformance with CGMP.

98.    At the time the SynchroMed® II Devices and its associated equipment in this case was manufactured and/or packaged and/or inspected and/or tested and/or labeled and/or distributed, Defendants had failed to comply with CGMP requirements and other federal law, and the SynchroMed® II Device and associated equipment, did not comply with the FDCA and applicable federal regulations and were therefore not in conformance with federal law governing the safe manufacture and performance of the SynchroMed® II Devices, and Defendants thereby violated parallel state law by failing to use reasonable care in manufacturing the SynchroMed® II Devices so as to protect users of their product such as Plaintiff.

99.    Through its failure to conform to CGMP (and/or other applicable regulations), MEDTRONIC was unable to verify, in accordance with FDA regulations, that the

SynchroMed® II Devices and/or related equipment used by Plaintiff was (were) safe and effective, fully conformed to specifications, and was (were) free of manufacturing defects that could lead to malfunctions having the potential to cause or contribute to serious bodily injury and/or death.

100. At the times and places aforesaid and at all times material hereto, the SynchroMed® II Devices at issue and/or related equipment malfunctioned as a direct and proximate result of manufacturing defects alleged herein, failing to deliver, without warning of any malfunction, the programmed dose of medicine and therefore did not perform in accordance with or conform to the specifications of regulations in the manufacturing process of the SynchroMed® II Devices, which formed the basis of the FDA's approval to market the device.

101. At the times and places aforesaid and at all times material hereto, the catheters at issue were occluded, fractured, obstructed, and/or malfunctioning, which caused Plaintiff to suffer severe injuries. These product failures were the result of violations of federal law that occurred during the manufacturing process of the devices and which formed the basis of the FDA's approval to market the device.

102. At the times and places aforesaid, and at all times material hereto, Defendants, and each of them, placed into the stream of commerce the SynchroMed® II Device at issue and/or related equipment which reached Plaintiff without substantial change in condition and failed to perform in accordance with or conform to the specifications approved by the FDA and/or failed to function as intended and/or malfunctioned and were therefore not safe and effective, were unfit for their intended and foreseeable uses, and were in a defective and dangerous condition at the time they were used by Plaintiff.

103.   Defendants, and each of them, caused or otherwise allowed, enabled or facilitated the placement of dangerous products in a defective condition into the stream of commerce, as hereinbefore set forth, and are strictly liable in tort.

104.   As a foreseeable, direct, and proximate result of Defendants' actions described above, the SynchroMed® II Device and/or its related equipment was in a dangerous and defective condition at the time it reached Plaintiff, including but not limited to defects in the subject catheter, and as a direct result of the defect, Plaintiff suffered crippling injuries which left Plaintiff with permanent and significant disabilities compensable under the law.

**SECOND COUNT:**
**LOUISIANA PRODUCT LIABILITY ACT**
**CONSTRUCTION OR COMPOSITION DEFECT (LA. R.S. 9:2800.55)**

105.   Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in the paragraphs above, with the same force and effect as if more fully set forth herein.

106.   At all times material to this action, Defendants were engaged in the business of designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling the SynchroMed® II Device and its associated equipment.

107.   At all times material to this action, the SynchroMed® II Device and its associated equipment was expected to reach, and did reach, consumers in the State of Louisiana and throughout the United States, including Plaintiff herein without substantial change in the condition in which it was sold.

108.  At all times material to this action, the SynchroMed® II Device and its associated equipment was designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by Defendants in a defective and unreasonably dangerous condition at the time it was placed in the stream of commerce in ways which include, but are not limited to, one or more of the following particulars:

a.  When placed in the stream of commerce, the SynchroMed® II Device and its associated equipment contained manufacturing defects which rendered the subject product unreasonably dangerous;

b.  The SynchroMed® II Device and its associated equipment's manufacturing defects occurred while the product was in the possession and control of the Defendants;

c.  The SynchroMed® II Device and its associated equipment was not made in accordance with the federal specifications or performance standards; and

d.  The SynchroMed® II Device and its associated equipment's manufacturing defects existed before it left the control of the Defendants.

109.  The subject product manufactured and/or supplied by Defendants was defective in construction or composition in that, when it left the hands of Defendants, it deviated in a material way by failing to comply with FDA and applicable federal regulations and was therefore not in conformance with federal law. In particular, the SynchroMed® II Device is not safe and has numerous and serious malfunctions which causes severe and permanent injuries and/or death. The SynchroMed® II Device was unreasonably dangerous in construction or composition as provided by La. R.S. 9:2800.55.

110.    The composition and construction of the SynchroMed® II Device implanted in
Plaintiff malfunctioned causing Plaintiff to suffer pain and serious injury, and forced
her to require follow-up medical care.

### THIRD COUNT:
### LOUISIANA PRODUCT LIABILITY ACT
### DESIGN DEFECT (LA. R.S. 9:2800.56)

111.    Plaintiffs repeat, reiterate and re-allege each and every allegation of this Complaint
contained in the paragraphs above, with the same force and effect as if fully set forth
herein.

112.    The SynchroMed® II Device is defective in its design or formulation in that it is not
reasonably fit, suitable, or safe for its intended purpose and/or its foreseeable risks
exceed the benefits associated with its design and formulation. The subject product was
unreasonably dangerous in design as provided by La. R.S. 9:2800.56.

113.    At all times material to this action, the SynchroMed® II Device and its associated
equipment was expected to reach, and did reach, consumers in the State of Louisiana
and throughout the United States, including Plaintiff herein, without substantial change
in the condition in which it was sold.

114.    At all times material to this action, the SynchroMed® II Device and its associated
equipment was designed, developed, manufactured, tested, packaged, promoted,
marketed, distributed, labeled, and/or sold by MEDTRONIC in a defective and
unreasonably dangerous condition at the time it was placed in the stream of commerce
in ways which include, but are not limited to, one or more of the following particulars:

   a.   When placed in the stream of commerce, the SynchroMed® II Device contained
unreasonably dangerous design defects and was not reasonably safe as intended to

be used, subjecting Plaintiff to risks that exceeded the benefits of the subject product, including but not limited to permanent and significant personal injuries and/or death;

b. When placed in the stream of commerce, the SynchroMed® II Device and/or its related equipment was defective in design and formulation, making the use of the SynchroMed® II Device more dangerous than an ordinary consumer would expect, and more dangerous than other risks associated with the other pain pumps on the market used to treat Plaintiff's condition;

c. The SynchroMed® II Device's design defects existed before it left the control of the Defendants;

d. The SynchroMed® II Device was insufficiently tested;

e. The SynchroMed® II Device caused harmful side effects that outweighed any potential utility; and

f. The SynchroMed® II Device was not accompanied by adequate instructions and/or warnings to fully apprise consumers, including Plaintiff herein, of the full nature and extent of the risks and side effects associated with its use, thereby rendering Defendants liable to Plaintiff.

115. In addition, at the time the subject product left the control of the Defendants, there were practical and feasible alternative designs that would have prevented and/or significantly reduced the risk of Plaintiff's injuries without impairing the reasonably anticipated or intended function of the product. Such safer alternative designs were economically and technologically feasible, and would have prevented or significantly

reduced the risk of Plaintiff's injuries without substantially impairing the product's utility.

116.    The faulty design of the SynchroMed® II Device and its associated equipment causes the device to fail to deliver, without warning of any malfunction, the programmed dose of medicine.

117.    This design defect caused Plaintiff's pain, suffering and serious bodily injury, and has forced her to seek additional medical care.

118.    MEDTRONIC has conceded the defective design of the SynchroMed® II Device by virtue of the Consent Decree of April 27, 2015.

## FOURTH COUNT:
## NEGLIGENCE/FAILURE TO WARN/INADEQUATE WARNING

119.    Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

120.    The averments alleged in this Count include breaches of duties under Louisiana law that parallel duties set forth in federal statutes and regulations described above. Such duties include, but are not limited to, those set forth in 21 C.F.R. 801, *et seq*., 21 C.F.R. 803, *et seq*., 21 C.F.R. 814, *et seq*., 21 C.F.R. 806, *et seq*., 21 C.F.R. 820, *et seq*., and 21 U.S.C. §§ 351-352.

121.    Defendants, and each of them, are medical device entities engaged in the design and/or research and/or manufacture and/or production and/or testing and/or assembling and/or labeling and/or packaging and/or distribution and/or sale and/or otherwise placing into the stream of commerce various medical devices intended for human use, including the SynchroMed® II Devices, and for facilitating the infusion and/or consumption and ingestion of pharmaceutical products for the treatment of specific medical conditions.

122.   At the times and places aforesaid and at all times material hereto, Defendants, and each of them, held themselves out as knowledgeable and possessing the requisite skill particular to the design and/or research and/or manufacture and/or production and/or testing and/or assembling and/or labeling and/or packaging and/or distribution and/or sale and/or otherwise placing in the stream of commerce such product(s).

123.   At the times and places aforesaid, and at all times material hereto, Defendants had a duty to conform to federal law and in particular with the provisions of the FDCA, and particularly with the Current Good Manufacturing Practice (CGMP) requirements of the Quality System regulation found at Title 21, Code of Federal Regulations (C.F.R.), Part 820, *et seq*. which "govern the methods used in, and the facilities and controls used for, the design, manufacture, packaging, labeling, storage, installation, and servicing of all finished devices intended for human use," and which are "intended to ensure that finished devices will be safe and effective and otherwise in compliance with the Federal Food, Drug and Cosmetic Act." (21 C.F.R. 820.1).

124.   In the State of Louisiana, a manufacturer has a duty to use reasonable care to provide adequate warnings of product dangers to persons such as Plaintiff who may be exposed to harm when the product is used as intended, or is used in a way that the manufacturer could have reasonably anticipated.

125.   MEDTRONIC knew at all times before Plaintiff was implanted with a SynchroMed® II Device that the device was defective and unreasonably dangerous when it left the possession of the Defendants in that it contained warnings insufficient to alert consumers, of the full nature and extent of the risks and side effects associated with its use, thereby rendering Defendants liable to Plaintiff of the dangerous risks and

reactions associated with the subject product, including but not limited to its propensity to cause permanent physical injury, pain and other serious side effects. MEDTRONIC also knew that the catheters that he would receive were defective and became occluded, fractured, and/or obstructed, and/or malfunctioned at a high rate, but failed to inform or otherwise warn the FDA, medical providers, and consumers such as Plaintiff of the high failure rates. Had Plaintiff, her medical providers, and/or the FDA been properly warned of the high failure rates of the catheters at issue, he could have avoided the injuries he suffered. Thus, the subject product was unreasonably dangerous because an adequate warning was not provided as provided pursuant to La. R.S. 9:2800.57.

126.   The subject product manufactured and supplied by MEDTRONIC was defective due to inadequate post-marketing warning or instruction because, after METDRONIC knew or should have known of the risk of serious bodily harm from the use of the subject product, MEDTRONIC failed to provide an adequate warning to consumers and/or their health care providers of the defects of the product, and/or alternatively failed to conform to federal and/or state requirements for labeling, warnings and instructions, or recall, while knowing that the product could cause serious injury.

127.   Plaintiff was used the subject product for its intended purpose.

128.   Plaintiff could not have discovered any defect in the subject product through the exercise of reasonable care.

129.   Defendants, as manufacturers and/or distributors of the SynchroMed® II Device are held to a level of knowledge of an expert in the field.

130.   The warnings that were given by the Defendants were not accurate, clear and/or were ambiguous.

131.   At the times and places aforesaid and at all times material hereto, Defendants were in violation of the CGMP requirements and/or other federal law governing the proper labeling and warning of its SynchroMed® II Devices and specifically had been cited by the FDA on multiple occasions for manufacturing "*adulterated*" and "*misbranded*" products as a result of their non-compliance and non-conformance with CGMP.

132.   MEDTRONIC knew, at all times before Plaintiff was implanted with SynchroMed® II Devices, that Plaintiff's devices were "*adulterated*" and "*misbranded*" despite representing to Plaintiff and her medical providers that the devices were "safe and effective" and "approved by the FDA".

133.   At the time the pump and its associated equipment in this case was manufactured and/or packaged and/or labeled and/or distributed, Defendants had failed to comply with CGMP requirements and the SynchroMed® II Devices and its associated equipment did not comply with the FDCA and applicable federal regulations and therefore violated federal law governing manufacture and performance of the SynchroMed® II Devices.

134.   The failure to conform to CGMP or other applicable federal regulations means MEDTRONIC was unable to ensure, in accordance with FDA regulations, that the SynchroMed® II Devices at issue was (were) safe and effective, fully conformed to specifications, and was (were) free of defects that could lead to malfunctions having the potential to cause or contribute to serious bodily injury and/or death.

135.   At the times and places aforesaid and at all times material hereto, the SynchroMed® II Devices at issue malfunctioned, failing to deliver, without warning of any malfunction, the programmed dose of medicine and therefore did not perform

in accordance with or conform to the specifications which formed the basis of the FDA's approval to market the SynchroMed® II Devices. Further, Defendants failed to provide Plaintiff with any warning that the devices were not manufactured in conformance with CGMP.

136.   At the times and places aforesaid, and at all times material hereto, Defendants, and each of them, placed into the stream of commerce the SynchroMed® II Device at issue and/or related equipment which reached Plaintiff without substantial change in condition and failed to perform in accordance with or conform to the specifications approved by the FDA and/or failed to function as intended and/or malfunctioned and were therefore not safe and effective, were unfit for their intended and foreseeable uses, and were in a defective and dangerous condition at the time they reached Plaintiff.

137.   Defendants, and each of them, caused or otherwise allowed, enabled or facilitated the placement of dangerous products in a defective condition into the stream of commerce, as set forth herein, and failed to warn Plaintiff, her medical providers, and the FDA of their defective nature and are therefore strictly liable in tort.

138.   As a foreseeable, direct and proximate result of Defendants' failure to warn Plaintiff, her medical providers, and the FDA, as set forth above, about the defective condition of the SynchroMed® II Devices, Plaintiff suffered crippling injuries that left Plaintiff with permanent and significant disabilities compensable under the law.

### FIFTH COUNT:
### BREACH OF EXPRESS WARRANTY

139.   Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in the paragraphs above, with the same force and effect as if fully set forth herein.

140.   The averments alleged in this Count include breaches of duties under Louisiana law that parallel duties set forth in federal statutes and regulations described above.

141.   The Defendants expressly warranted by way of written literature, including, but not limited to product labeling, patient package inserts, articles in medical journals, advertising and/or other documents and/or promotional materials, directed to Plaintiff or Plaintiff's medical providers, by and through statements made by Defendants, and each of them, or their authorized agents or sales representatives, orally and/or in publications that SYNCHROMED® II INFUSION PUMP MODEL 8637-40 AND CATHETER 8709SC conformed to FDA regulations and specifications, and were safe, effective, fit and proper for its intended uses and foreseeable uses and efficacious in alleviating pain stating it was to deliver medication to treat cancer, chronic pain and severe spasticity.

142.   At the time of the making of the express warranties, Defendants knew or should have known of the purpose for which the subject product was to be used and warranted the same to be, in all respects, fit, safe, and effective and proper for such purpose. The subject product was unreasonably dangerous because it failed to conform to an expressed warranty of the Defendants as provided by La. R.S. 9:2800.58.

143.   At the time of the making of the express warranties, Defendant knew or should have known that, in fact, said representations and warranties were false, misleading, and untrue in that the subject product was not safe and fit for its intended use and, in fact, produces serious injuries to the user.

144.   At all times material hereto, Plaintiff and her physicians relied upon the Defendants' express warranties that SYNCHROMED® II INFUSION PUMP MODEL

8637-40 AND CATHETER 8709SC conformed to FDA regulations and specifications was safe and fit for such uses, when in fact the device was manufactured in violation of Federal Regulations and specifications, and it was unsafe and unfit for such uses. The warranty and representations were untrue in that:

a.  The FDA had determined that the MEDTRONIC SynchroMed® II Devices implanted in Plaintiff were manufactured in violation of Federal Regulations and specifications, including regulations that govern CGMP;

b.  The FDA violations committed by MEDTRONIC of the CGMP meant that MEDTRONIC was unable to confirm that the Devices implanted in Plaintiff were safe and effective, fully conformed to specifications and were free of defects that lead to malfunctions having the potential to cause or contribute to serious bodily injury;

c.  The FDA had determined that the devices implanted in Plaintiff were manufactured at a time when SynchroMed® II Devices were labeled *"Adulterated"* and *"Misbranded".*

145.  The Plaintiff used SYNCHROMED® II INFUSION PUMP MODEL 8637-20 AND CATHETER 8780 based upon the express warranties of the Defendants and in reliance upon her physicians, and as a result thereof, the Plaintiff suffered injuries caused by SYNCHROMED® II INFUSION PUMP MODEL 8637-20 AND CATHETER 8780.

146.  As a result of the aforementioned breach of their express warranties by Defendants and each of them, Plaintiff suffered injuries and sustained damages compensable under the law.

## SIXTH COUNT:
## REDHIBITION

147.   Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in the paragraphs above, with the same force and effect as if fully set forth herein.

148.   The subject product contains a vice or defect which renders it useless or its use so inconvenient that buyers would not have purchased it.

149.   Prior to the time that the SynchroMed® Devices were implanted and used by Plaintiff, Defendants, and each of them impliedly warranted to Plaintiff and/or Plaintiff's medical providers that the SYNCHROMED® II INFUSION PUMP MODEL 8637-20 AND CATHETER 8780 were safe and fit for the purposes for which they were provided and that the SynchroMed® Devices were of merchantable quality, were manufactured and/or packaged and/or labeled in accordance with FDA regulations, complied with applicable FDA approved specifications and were safe, effective and fit for the use for which they were intended or for other known or foreseeable uses.

150.   Plaintiff was and is unskilled in the research, design, and manufacture of the SynchroMed® II Devices and reasonably relied entirely on the skill, judgment, and warranties of Defendants, and each of them, in being prescribed, purchasing, consuming, and otherwise utilizing the SynchroMed® II Devices.

151.   At the time and place that Plaintiff used SYNCHROMED® II INFUSION PUMP MODEL 8637-20 AND CATHETER 8780, Plaintiff relied upon the Defendants' implied warranties, not knowing Defendants knew, that in fact SYNCHROMED® II INFUSION PUMP MODEL 8637-20 AND CATHETER 8780 was unfit and unsafe for the purposes for which they were provided, and had been found by the FDA to be

47

"Adulterated" and "Misbranded", in that they were not manufactured and/or packaged and/or labeled in accordance with FDA regulations, did not perform to or perform in accordance with approved specifications and were therefore not safe nor effective for their intended, known or foreseeable uses nor of merchantable quality, as warranted by Defendants.

152. The MEDTRONIC SynchroMed® II Devices implanted in Plaintiff, had the potential to malfunction and cause serious and permanent injuries, including death, when put to their intended, known or foreseeable uses.

153. Under Louisiana law, the seller warrants the buyer against redhibitory defects, or vices, in the thing sold. La. C.C. art. 2520. The subject product sold and promoted by Defendants, possesses a redhibitory defect because it was not manufactured and marketed in accordance with industry standards and/or is unreasonably dangerous, as described above, which renders the subject product useless or so inconvenient that it must be presumed that a buyer would not have bought the subject product had he known of the defect. Pursuant to La. C.C. art. 2520, Plaintiff is entitled to obtain a rescission of the sale of the subject product.

154. The subject product alternatively possesses a redhibitory defect because the subject product was not manufactured and marketed in accordance with industry standards and/or is unreasonably dangerous, as described above, which diminishes the value of the subject product so that it must be presumed that a buyer would still have bought it but for a lesser price. In this instance, Plaintiff is entitled to a reduction of the purchase price.

155.    As a result of the aforementioned breach of their implied warranties by Defendants, and each of them, Plaintiff, after being implanted with, and/or after purchasing and/or otherwise utilizing MEDTRONIC's non-conforming, defective products, suffered injuries and sustained damages compensable under the law.

156.    Defendants are liable as bad faith sellers for selling a defective product with knowledge of the defect, and thus, are liable to Plaintiff for the price of the subject product, with interest from the purchase date, as well as reasonable expenses occasioned by the sale of the subject product, and attorneys' fees. As the manufacturer of the subject product, under Louisiana law, Defendants are deemed to know that the SynchroMed® II Devices possessed a redhibitory defect. La. C.C. art. 2545.

## SEVENTH COUNT:
## FRAUD

157.    Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in the paragraphs above, with the same force and effect as if more fully set forth herein.

158.    Defendants misrepresented or suppressed certain material facts which Defendants had a duty to disclose to Plaintiff pursuant to Louisiana Civil Code Article 1953.

159.    At all times material hereto, Defendants negligently or intentionally made representations of material facts to Plaintiff and the consuming public and the medical community and the FDA which were in fact false, including but not limited to the following:

   a.   That the SynchroMed® II Devices would relieve pain for patients who have not received adequate relief with conventional therapies.

b.  That the SynchroMed® II Devices would result in a reduction in adverse effects from oral opioids such as nausea, vomiting, sedation, and constipation.

c.  That the SynchroMed® II Device would cause significant improvement of function and significant improvement in quality of life.

d.  That at all times, these representations were in fact false.

e.  That at all times when Defendants made these representations, Defendants had no reasonable grounds for believing the representations were true and later, knew they were false.

160.  Defendants made the representations with the intent to defraud and induce Plaintiff to purchase SYNCHROMED® II INFUSION PUMP MODEL 8637-20 AND CATHETER 8780. At the time Plaintiff purchased SYNCHROMED® II INFUSION PUMP MODEL 8637-20 AND CATHETER 8780, Plaintiff did not know the representations were false and believed they were true and justifiably relied on the representations made by Defendants.

161.  At all times material hereto, Defendants concealed or suppressed material facts regarding the dangers posed by SYNCHROMED® II INFUSION PUMP MODEL 8637-20 AND CATHETER 8780 and its lack of efficacy.

162.  At all times material hereto, Defendants had a duty to disclose the material facts to the medical community so that doctors could inform Plaintiff and other patients. Defendants also told doctors and Plaintiff other facts to mislead Plaintiff and prevent Plaintiff from discovering the concealed or suppressed facts.

163.  At all times material hereto, Defendants concealed or suppressed these facts with the intent to defraud and induce Plaintiff to purchase SYNCHROMED® II INFUSION

PUMP MODEL 8637-20 AND CATHETER 8780. At the time Plaintiff purchased SYNCHROMED® II INFUSION PUMP MODEL 8637-20 AND CATHETER 8780, Plaintiff was unaware of the concealed or suppressed facts and would not have purchased and used SYNCHROMED® II INFUSION PUMP MODEL 8637-20 AND CATHETER 8780 had he known the facts.

164.   As a result of the fraudulent conduct of Defendants as described above, Plaintiff suffered injuries caused by SYNCHROMED® II INFUSION PUMP MODEL 8637-20 AND CATHETER 8780.

165.   As a result of the fraudulent conduct of the Defendants as described above, Plaintiff is entitled to recovery for personal injuries, pain, suffering, disfigurement, past and future medical expenses, loss of income and other economic damages.

166.   Louisiana Federal Courts recognize that a Plaintiff may invoke the fraudulent concealment doctrine provided that the defendants concealed the conduct complaint of, and that the Plaintiff failed, despite the exercise of due diligence on his part, to discover the facts that form the basis of her claim.

167.   Plaintiff pleads that the discovery rule should be applied to toll the running of the statute of limitations.

168.   Through reasonable care and due diligence, the cause of Plaintiff's injuries could not have been discovered, until a date within the applicable statute of limitations. Therefore, under appropriate application of the discovery rule, Plaintiff's suit was filed well within the applicable statutory limitations period.

169.   The running of the statute of limitations in this cause is tolled during anytime in which Plaintiffs suffered under a legal disability.

170.    Defendant is estopped from asserting a statute of limitations defense because Defendant fraudulently concealed from Plaintiff the nature of her injuries and the connection between the injury and Defendant's tortious conduct.

## EIGHTH COUNT:
## VIOLATIONS UNDER MINNESOTA CONSUMER FRAUD ACT
## (Minn. Stat. § 325F.69)

171.    Plaintiffs repeat, reiterate and re-allege each and every allegation of this Complaint contained in the paragraphs above, with the same force and effect as if fully set forth herein.

172.    The Minnesota Consumer Fraud Act prohibits false and misleading statements and false promises made in connection with the sale of any merchandise.

173.    Plaintiff has standing to bring this action pursuant to Minnesota's private attorney general statute, Minn. Stat. § 8.31, subd. 3a which reads: "any person injured by a violation of any of the laws referred to in subdivision 1 may bring a civil action and recover damages, together with costs and disbursements, including costs of investigation and reasonable attorney's fees, and receive other equitable relief as determined by the court."

174.    Defendants are a person as defined by Minn. Stat. § 325F.68, subd.3.60.

175.    A MEDTRONIC SynchroMed® II Device is merchandise within the meaning of Minn. Stat. § 325F.68, subd. 2. 61.

176.    A MEDTROINC SynchroMed® II Device is and has been advertised and sold within the meaning of Minn. Stat. § 325F.68, subd. 4. 62.

177.    Defendants are violating and have violated the Minnesota Consumer Fraud Act by representing that the SynchroMed® II Devices are safe for use in the human body, and

failing to disclose that SynchroMed® II Devices received by Plaintiff contains manufacturing defects and has been manufactured in violation of federal regulations and is *"misbranded"* and *"adulterated"* within the meaning of federal regulations.

178.   MEDTRONIC communicated the false and misleading statements to the public in general and specifically to Plaintiff, with the intention that Plaintiff would rely on the statements and in connection with the sale of the SynchroMed® II Devices.

179.   As a direct and proximate result of MEDTRONIC's violation, Plaintiff has been damaged in an amount to be proven at trial.

180.   Plaintiff is elderly or disabled and therefore is entitled to an additional civil penalty of ten thousand dollars ($10,000.00) for each violation of the Minnesota Consumer Fraud Act. (See Minn. Stat. § 325F.71).

### NINTH COUNT:
### MINNESOTA FALSE ADVERTISING ACT
### (Minn. Stat. § 325F.67)

181.   Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in the paragraphs above, with the same force and effect as if fully set forth herein.

182.   Plaintiff has standing to bring this action pursuant to Minnesota's private attorney general statute, Minn. Stat. § 8.31, subd. 3a, which reads: "any person injured by a violation of any of the laws referred to in subdivision may bring a civil action and recover damages, together with costs and disbursements, including costs of investigation and reasonable attorney's fees, and receive other equitable relief as determined by the court."

183.    The Minnesota False Advertising Statue prohibits advertisements containing "untrue, deceptive, or misleading" representations "with intent to sell or in anywise dispose of merchandise to increase the consumption thereof, or to induce the public in any manner" MEDTRONIC made representations about the SynchroMed® II Device that contained untrue, deceptive or misleading representations with the intent to sell or dispose of the Device, in that it represented the device was free from manufacturing defects and manufactured in compliance with federal law. MEDTRONIC failed to disclose to consumers in general and specifically Plaintiff that the FDA had determined that the SynchroMed® II Device implanted in Plaintiff was *misbranded"* and *"adulterated."*

184.    MEDTRONIC failed to disclose to consumers in general and specifically to Plaintiff that at the time the devices were manufactured, that the FDA had determined and that MEDTRONIC admitted, that MEDTRONIC's Minneapolis and Puerto Rico manufacturing plants were manufacturing the SynchroMed® II Device in violation of FDA regulations.

185.    MEDTRONIC's representations through its Sales Representatives, brochures, Package Insert, Internet communications, Opinion Leaders, Patient Nurses, and patient testimonials, about the SynchroMed® II Device to medical providers and the public in general, and specifically to Plaintiff are advertisements for the purpose of the Statute.

186.    MEDTRONIC made false representations, and failed to disclose material representations to the public and Plaintiff with the intent to sell the SynchroMed® II Device to Plaintiff and others, thereby causing damages.

187. As a direct and proximate result of MEDTRONIC's violation, Plaintiff has been damaged in an amount to be proven at trial.

188. Plaintiff is elderly or disabled and therefore is entitled to an additional civil penalty of ten thousand dollars ($10,000.00) for each violation of the Minnesota Consumer Fraud Act. (See Minn. Stat. § 325F.71).

**TENTH COUNT:**
**MINNESOTA UNLAWFUL TRADE PRACTICES ACT**
**(Minn. Stat. § 325D.13)**

189. Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in the paragraphs above, with the same force and effect as if fully set forth herein.

190. The Unlawful Trade Practices Act states that "[n]o person shall, in connection with the sale of merchandise, knowingly misrepresent, directly or indirectly, the true quality, ingredient or origin of such merchandise."

191. Plaintiff has standing to bring this action pursuant to Minnesota's private attorney general statute, Minn. Stat. § 8.31, subd. 3a, which reads: "any person injured by a violation of any of the laws referred to in subdivision may bring a civil action and recover damages, together with costs and disbursements, including costs of investigation and reasonable attorney's fees, and receive other equitable relief as determined by the court."

192. MEDTRONIC represented to the public in general and specifically Plaintiff that the SynchroMed® II Devices implanted in Plaintiff were safe and effective, and manufactured without defects in compliance with federal regulations.

193. At the time MEDTRONIC made these representations to the public and Plaintiff, MEDTRONIC knew that the FDA had determined that the SynchroMed® II Devices implanted in Plaintiff:

   a. Were manufactured in violation of federal regulations and specifications, including regulations that govern CGMP and that the FDA violations of the CGMP meant that MEDTRONIC was unable to confirm that the Devices implanted in Plaintiff were safe and effective, fully conformed to specifications and were free of defects that could lead to malfunctions having the potential to cause or contribute to serious bodily injury.

   b. Were manufactured at a time when SynchroMed® Devices were labeled *"Adulterated"* and *"Misbranded"*.

194. That had Plaintiff and/or Plaintiff's physician knew of Defendant's misrepresentations of the SynchroMed® II Devices prior to their implantation in Plaintiff, the Devices would not have been purchased by Plaintiff.

195. As a direct and proximate result of MEDTRONIC's violation, Plaintiff has been damaged in an amount to be proven at trial.

196. Plaintiff is elderly or disabled and therefore is entitled to an additional civil penalty of ten thousand dollars ($10,000.00) for each violation of the Minnesota Consumer Fraud Act. (See Minn. Stat. § 325F.71).

## ELEVENTH COUNT:
## LOSS OF CONSORTIUM

197. Plaintiffs hereby incorporate and reaver all of the allegations contained in the above and foregoing paragraphs of this Complaint for Damages in their entirety as if fully rewritten herein.

198.   Plaintiff Thomas Musser is the spouse of Plaintiff Buna Jean Musser, and as a direct and proximate cause of the Defendants' conduct as described in the Complaint for Damages, Mr. Thomas has necessarily paid and has become liable to pay for medical aid, treatment, attendance and medications, and will necessarily incur further expenses of a similar nature in the future.

199.   As a direct and proximate cause of the above-described injuries sustained by Plaintiff Buna Jean Musser, her husband, Plaintiff Thomas Musser, has suffered a loss of his wife's consortium, companionship, society, affection, services and support.

200.   As a direct and proximate result of Defendants' conduct as described in this Complaint for Damages, Plaintiff Thomas Musser is entitled to and hereby seeks all such compensatory damages, attorneys' fees, reimbursement for all past, present and future health and medical costs related to the Defendants' Medtronic Products, and any and all damages allowed by law, in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants MEDTRONIC, Inc.; MEDTRONIC, Neuromodulation, a Division of MEDTRONIC, Inc.; MEDTRONIC Puerto Rico Operations; and MEDTRONIC Logistics, LCC as follows:

   a.   For an award of compensatory damages in excess of $75,000.00;

   b.   For the costs and expenses of this litigation to the Plaintiff;

   c.   For reasonable attorney fees and costs;

   d.   For pre-judgment and post-judgment interest; and

   e.   For any such further relief this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all causes of actions and as to all issues.

Dated: April 27, 2016                                         Respectfully submitted,

BY: /s/ MELISSA A. DEBARBIERIS
Joseph M. Bruno, (La. Bar #3604)
Melissa A. DeBarbieris (La. Bar #32124)
BRUNO & BRUNO, LLP
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525.1335
Facsimile: (504) 561.6775
*Attorneys for Plaintiffs Buna Jean Musser*
*and Thomas Musser*